Elsie McCOLGIN and Densel McColgin, Plaintiffs-Respondents,

v.

Eula Lois MORGAN, Defendant-Appellant.

No. 10241.

Missouri Court of Appeals, Southern District, En Banc.

Dec. 18, 1979.

Donald E. Bonacker, Jerry L. Reynolds, Bonacker & Reynolds, Springfield, for plaintiffs-respondents.

Nobel I. Leighton, Jr., David W. Bernhardt, Bussell, Hough, Bernhardt, Leighton & O'Neal, Springfield, for defendant-appellant.

MAUS, Judge.

The defendant appeals from adverse jury verdicts in a motor vehicle accident case. The accident occurred at the "T" intersection of U. S. Highway 137 and Wildwood Drive north of Raymondville. In general terms, the accident occurred when defendant Eula Morgan who was approaching Highway 137 from the east on Wildwood stopped and then made a U-turn on Wildwood. Plaintiff Elsie McColgin, who was approaching from the south on Highway 137, apparently (and in due deference to the defendant's argument the term is used advisedly) swerved to her left and collided with a south-bound Toyota Jeep-type vehicle driven by Fred E. Williams.

At the scene, Highway 137 ran generally north and south and had a blacktop surface 20 to 22 feet in width with shoulders of approximately 2 feet. Wildwood extended east from its "T" intersection with Highway 137. There were curves in Highway 137 north and south of the "T" intersection. The sight distance down the highway between the two curves was approximately 800 feet, being from the center of Wildwood approximately 500 feet to the north curve and approximately 300 feet to the south curve. Wildwood was a gravel road of undisclosed width that fanned out as it approached Highway 137 so that at the intersection the mouth of Wildwood was 150 feet wide. While generally Wildwood was a gravel road, it had a blacktop surface at the mouth extending east approximately 14 feet from the east edge of Highway 137. There was a fence around the field at the southeast corner of the intersection. Along the east side of Highway 137, south of the intersection, this fence was set back an undisclosed, but as appears from the photographs in evidence, an appreciable distance from the east side of Highway 137. The fence was also set back from the south side of Wildwood. At the time of the accident there was brush along this fence that obscured vision across the field at the southeast corner. At the time of trial, and when the photographs were made, the fence row had been cleaned out, but the fence was in the same place. Highway 137 as it approached the intersection from the south was straight for approximately 12 steps from the south edge of Wildwood where it joined the highway, or for approximately 22 steps from the corner post in the fence. At the time of the accident it was raining and Highway 137 was described as slick.

The morning of the accident Elsie McColgin had left her child with the baby sitter at the usual time and was driving north on Highway 137 to her work in Salem. Because of retrograde amnesia the plaintiff had no memory of the events surrounding the accident.

Fred E. Williams, employed as a wood superintendent, was driving from his home in Salem south on Highway 137 to his work in his employer's timber land. He approached the intersection at an estimated speed of 40–45 miles per hour. As he was coming out of the curve north of the intersection he first saw the defendant's automobile starting to turn, headed northwest on Wildwood, moving at a vaguely estimated speedy of 5–10 miles per hour. He observed the defendant make at least a portion of her U-turn and come "awful close" to Highway 137. He didn't see the plaintiff "exactly the same time, but close. . . . There wasn't too much difference." When he took his eyes off the defendant's automobile, she was between a third and half

way through her U-turn. When he saw the plaintiff's automobile, it was coming out of the turn south of the intersection sliding. He didn't think he hit his brakes or swerved before he saw the plaintiff. But, in response to the following question, "In other words, the first time you had to brake or swerve was when the McColgin car was coming at you in your lane?" He replied: "I wouldn't say." He did swerve and brake and was sliding. He was sure he didn't get over the centerline. He summed up the situation by saying, "Well, I was coming around this curve and I saw this one car coming up Wildwood Lane and I didn't know if it was going to stop or not; of course, I got on my brakes and about this time there come the McColgin car from the other way and it was sliding." He first wouldn't say how fast McColgin was going then guessed faster than he, and later added, not much faster.

H. E. Lewis, driving a "10-wheeler" truck, was following Williams at a distance of about two or three car lengths. He first saw the Morgan car just "before the road began to make the 'Y', as she come up to the 'Y' and circled out toward the left like she was going out on 137, but, instead, she made a U-turn." He did not see her stopped and she came within 6 or 8 feet of Highway 137. When he saw the defendant he braked and began to slide and the Williams' Toyota was sliding. He first saw the McColgin automobile when it was 20 or 30 feet from the Williams' Toyota and the automobile was sliding. It appeared to him that the Williams' Toyota and McColgin car were sliding sideways, with "the back ends next to the ditch and the front ends was going right down the line when they hit." Most of the debris was in the south-bound lane, although some was kicked off the north-bound lane. The debris was located to the north of an extension of Wildwood. When the impact occurred the defendant's automobile had partly completed her U-turn. Because the impact sent the Williams' Toyota to the west and the McColgin car to the east, Lewis' truck slid through and came to a stop.

Defendant Eula Morgan testified she intended to turn south on Highway 137 and go to Hartshorn. She approached the highway as if she was going to do so and stopped. She didn't know how far from the highway she stopped, but her front wheels were not on the asphalt apron. Because the highway was wet and slick, she decided to go back home. She backed up 2 or 3 feet, and then "I drove slow, right around in a U-turn." She stated she had stopped at the only place where you could see through the brush. There she looked but could see only 60 feet to the north and 30 or 40 feet to the south. She could not remember if she looked after backing and before starting forward. In making her U-turn, she had at least her two left wheels on the blacktop approach and could have come within 6 or 7 feet of the highway. While she was making her turn, she heard something, looked in her mirror, and stopped. She stopped 25 feet from the highway with her automobile headed northeast. At that time the McColgin automobile had come to rest, partially in the ditch at the northeast corner of the intersection.

■ On appeal the defendant contends the evidence was not sufficient to support the verdicts and the evidence did not support the verdict-directing instructions. Because the answer to the latter contention will be determinative of the first, the points will be considered in inverse order. The questioned instructions authorized verdicts for the plaintiffs if the jury found the defendant negligent in that she (1) failed to keep a careful lookout, or (2) made a U-turn when she knew, or by the highest degree of care should have known, that her movements would cause traffic on Highway 137 to take evasive action to avoid a collision with her automobile. In determining the sufficiency of the evidence in respect to those attacks, this court must consider the evidence in the light most favorable to the plaintiffs and give them the benefit of any favorable inferences that may reasonably be drawn therefrom and disregard the defendant's evidence unless it tends to support the grounds of negligence submitted. *Worley v. Tucker Nevils, Inc.*, 503 S.W.2d 417 (Mo. banc 1973).

The defendant's first attack is that failure to keep a careful lookout should not have been submitted because there was no evidence she could have seen the McColgin automobile. She cites her testimony that she stopped at the only place the fence row permitted her to see, which was when the front of her car was more than 14 feet east of the east edge of the highway. From that point she could see 30 to 40 feet to the south and looked and saw nothing. This is not decisive of the issue. The fence row did not directly border upon the highway. The defendant was under a continuing duty to keep a careful lookout when she backed up and then approached the highway. *Weathers v. Falstaff Brewing Corporation,* 403 S.W.2d 663 (Mo.App.1966). The fact that when the front of her car was more than 14 feet east of the highway she could see only 30 to 40 feet to the south could have been considered by the jury to emphasize her duty to keep a careful lookout as she backed up and then approached the federally marked highway. *Davidson v. Vast,* 233 Iowa 534, 10 N.W.2d 12 (1943); 3 Blashfield Auto Law 3rd Ed., § 114.40, p. 86. Photographs admitted in evidence established there was an appreciable distance from the east side of the highway to the fence, enough for the jury to conclude the defendant in approaching the highway could have seen the McColgin automobile. When and where the defendant was required to look was for the jury's determination. *Trimble v. Sipes,* 506 S.W.2d 353 (Mo.1974).

The defendant's next point is that even if the defendant failed to keep the required lookout, there was no evidence she could have and should have seen the McColgin automobile in time to take effective precautionary action. It is the rule that there is not a "submissible case without sufficient facts and circumstances, from which, at least, a permissible inference could be made and a jury could find, that such manner and means of avoidance existed." *Miller v. St. Louis Public Service Company,* 389 S.W.2d 769, 772 (Mo.1965). There is no direct evidence of such an opportunity; however, that opportunity may be established by calculations and reasonable inferences from the facts in evidence. *Mullen v. McDonald,* 494 S.W.2d 694 (Mo. App.1973). Under the circumstances the jury could have found the defendant should have seen the McColgin automobile the moment she reached a place beyond the fence row where she could see to the south. *Marshall v. Bobbitt,* 482 S.W.2d 439 (Mo.1972). There is no evidence of a measurement from the fence to the highway. However, the photographs do show this to be an appreciable distance. Of particular significance is a photograph taken from the south that shows an automobile on Wildwood approaching the highway. The automobile is in a position from which the driver would have had unlimited visibility to the south, yet the front end of the automobile is a substantial distance from the highway. The jury could have determined at this point the defendant's automobile was more than 10 feet from the highway, beginning to turn to the northwest, moving slowly, approximately 5 miles per hour. There was evidence from which it could have been determined that at the time of impact the defendant was about half way through her U-turn, having traveled approximately 30 feet at about 5 miles per hour from the place where she should have seen south down the highway. Taking Mrs. McColgin's speed at 45 to 50 miles per hour (a little faster than Williams), it is readily discernible that Mrs. McColgin was approximately 270 to 300 feet from the point of impact (within the range of vision established by the testimony of the highway patrolman and exhibits) when the defendant was in a place she should have seen the McColgin automobile. At a speed of approximately 5 miles per hour it may be judicially noticed that the defendant could have stopped her car almost instantly. *Hinrichs v. Young,* 403 S.W.2d 642 (Mo. 1966). Had she done so Mrs. McColgin would yet have been between 200 and 300 feet from the point of impact and would not have braked and swerved, or had she done so, could have reversed that action. Such a determination, based on calculation and inference, is supported by the testimony of

Williams that as he was coming out of the curve to the north, the defendant was beginning her U-turn to the northwest. This case is to be distinguished from *Michaud v. Burlingame*, 490 S.W.2d 680 (Mo.App.1973); *Shelton v. Bruner*, 449 S.W.2d 673 (Mo.App. 1969) and other cases cited by the defendant in which the evidence affirmatively established no opportunity for evasive action or in which there was no evidence of speed and position from which such an opportunity could be established. Nor is the defendant aided by *Powell v. Watson*, 526 S.W.2d 318 (Mo.App.1975), which she cites and quotes. In that case a passenger was attempting to establish failure to keep a careful lookout and excessive speed against her deceased host driver who started skidding 148 feet from a "T" intersection. In that case another driver approached on the intersecting road at a rapid speed, but stopped and then "gunned out" onto the through highway. The court noted the absence of evidence as to relative positions and speeds and held the position of the skid marks did not support either charge. In so holding the court made an observation appropriate to the actions of Mrs. McColgin: "The record justifies the inference that decedent fully realized his precarious position and undertook the only way of possible escape." *Powell v. Watson*, supra, 526 S.W.2d at 325–326. There was evidence from which the jury could conclude defendant's failure to keep a careful lookout was a proximate cause.

The defendant next contends the evidence was insufficient because there was no evidence that Mrs. McColgin ever saw the defendant and no evidence that any act of the defendant caused Mrs. McColgin to swerve and brake. The defendant emphasizes Williams' agreement with a leading question that the first time he had to brake or swerve was when he saw the McColgin automobile coming into his lane. This emphasis overlooks Williams' refusal to agree with that leading question the first time it was asked and his previous testimony, which the jury was entitled to believe, "Well, . . . I got on my brakes and

about this time there come the McColgin car from the other way and it was sliding." It also overlooks Lewis' reaction when it looked as if the defendant was turning south: "That's whenever I went to braking down. It looked like she was going to pull out right in front of the Jeep on the highway."

▇ It is true that Mrs. McColgin was unable to provide direct evidence she saw the defendant's automobile and that its movement caused her to brake and swerve. However, she was in a position where she could have seen the defendant's automobile. She is entitled to the benefit of all favorable, reasonable inferences from the evidence. " '[T]he inference drawn must be reasonable, and may not be arrived at by speculation or conjecture. But neither is the inference to be precluded by speculation or conjecture, or by a mere possibility that the contrary may be true. . . . Probabilities, not possibilities, are controlling.' " *Mills v. Keith Marsh Chevrolet, Inc.*, 549 S.W.2d 604, 607 (Mo.App.1977). The strong probability, and certainly a reasonable inference, is that Mrs. McColgin saw the movements of the defendant's automobile and attempted to avoid the threatened danger by braking and swerving to her left. *McDowell v. Mohn*, 426 S.W.2d 95 (Mo. 1968).

▇ There was evidence to support the instructions. The fact there was no contact between the McColgin automobile and that of the defendant does not mean the plaintiffs did not make a submissible case. *Worley v. Tucker Nevils, Inc.*, supra; *Hall v. Rager*, 357 S.W.2d 83 (Mo.1962). Nor does the fact that the defendant created only an appearance of danger. "Had no evasive action been taken it might be that no collision would have occurred. However, a jury could reasonably have found that under the circumstances Mrs. [McColgin] could reasonably have concluded that there would be a collision unless she took emergency action

269

in an effort to avoid it." *Hall v. Rager,* supra, 357 S.W.2d at 87.

The judgment is affirmed.

All concur except HOGAN, J., recused.